Good morning, your honors. May it please the court, Joseph Copland representing Daryl Allison in this Social Security appeal. This comes down to an issue of whether the administrative law judge who heard this Social Security disability case erred at step 5 of the analysis. We're agreed that Mr. Allison was not working, that he has several severe medically determinable impairments, that he doesn't need a listing, and that he is unable to do his past relevant work, which is all heavy as a deck attendant, a tugboat attendant, a seaman. He was able to do that work successfully until 1998 when he suffered an electrocution injury with the Washington State Ferries and it resulted in lighting up a pre-existing condition, a congenital condition, a shallow glenoid joint, which resulted in a very, very unstable shoulder which subluxates. Now, Mr. Allison also has a history of a brain injury, a traumatic brain injury at age 6, where he was in a coma for several weeks with permanent cognitive deficits, and I'm not contending that he's an unintelligent man, he is an intelligent man. Also a psychiatric condition of avoidant and prevent him from sustaining employment because he simply cannot self-limit. The error that the administrative law judge made in what I think is otherwise a very, very well-written and well-reasoned opinion is when she gets down to step 5 and she makes the unwarranted assumption that Mr. Allison can in fact self-limit and that he can keep his arms down, avoid overhead reaching, avoid sudden movements. And she does this by, in my view, improperly rejecting the opinion of Dr. Williamson Kirkland, the attending physician. Dr. Williamson Kirkland treated Mr. Allison for four years. He's a physiatrist, which is a physical rehabilitation medicine doctor. He treated Mr. Allison in a setting in 2003 and 2004. And I would refer you to the excerpts of record, page 334, where Dr. Williamson Kirkland said right at the outset, I told him very clearly he is to stop demonstrating his subluxation. He is to do everything possible to not subluxate his shoulder and work on muscle strength so he will not subluxate. Compare that to the various statements that... So if I may interrupt, because the ALJ is entitled to not credit Dr. Williamson Kirkland's opinion if she gives clear and convincing reasons. And so she went through a number of reasons as to why she didn't accept him, including the fact that he wasn't an expert in these mental issues, that his opinion was unsupported by treatment notes, evaluating signs and symptoms, the depression wasn't established, the psychometric testing showed that Mr. Allison could perform more complex tasks, and then looked at other people's testimony, including Dr. Louie, which said, no, there is not any connection to the extending his shoulder and work. So given that she went through a fairly lengthy explanation of why she discredited that doctor's conclusions, why should we not defer to that? What's wrong with what she did? What's wrong with what she did, and I use the term cherry pick, is she found Dr. Williamson Kirkland to be persuasive on the right shoulder. She completely disregarded his subjective opinions regarding his mental and emotional limitations. She found Jeffrey Powell, the psychologist who did the neuropsychological evaluation, to be credible in terms of cognitive functioning, but she disregarded his ultimate opinions and warnings. So let me start with Dr. Powell. Dr. Powell also found access to personality traits of an as well as the traumatic brain injury, and he warned that he appears, Mr. Allison appears to have had several false starts in returning to work, seems likely to be quite anxious regarding his ability to succeed. Given his personality, that anxiety will likely be an issue during her return to work and in need of clinical attention by a psychologist. And then on the last page, this is excerpts of record 210 and 211. I suspect Mr. Allison is at risk to sabotage a return to work effort if he becomes anxious about his performance. As you read Dr. Williamson Kirkland's chart notes, especially during 2006 and 2007, and these are, I believe, around excerpts of record 223 to 233, you see over and over again, this is a guy who ought to be able to work. He ought to be able to self-limit. He ought to be able to protect his right shoulder, but he is unable to do so, and whenever he has the slightest trauma, he tenses up, his shoulder subluxates, he finds himself in chronic pain, and he ends up in my office in tears, and you see that over and over again. So why is that opinion not properly credited? If you look at Code of Federal Regulations 404.1527, and you look at how you weigh the opinions, you give the most weight, not necessarily controlling weight, but the most weight to the attending physician who's treated the man over a long period of time, less weight to an examining but non-treating physician, and the least weight to someone like Dr. showing up at the hearing as a consultant. He doesn't know Mr. Allison, and he doesn't have the history with Mr. Allison, and so if you look at the factors in 1527.d.2, the length of the treatment relationship, the frequency of examination, the nature and extent of the relationship, and so forth, these factors all weigh very heavily in support of Dr. Williamson Kirkland. So are you saying then that the ALJ's reasons for discounting him were not clear and convincing? So you're saying that there was a legal error in her discrediting because those reasons were not clear and convincing? Yes. Is that your position? Yes, and then you get to the next step, which is that then becomes the foundation for the hypothetical to the vocational counsel. And what was omitted from the hypothetical? The fact that he had, that his dependent and avoidant personality disorders and cognitive disorder, number one, affect his... And as your contention, that would all be supported by Dr. Williamson? Yes. Affect his ability to effectively self-limit and disregards his somatic focus on pain in the right shoulder. Now opposing counsel had suggested, I guess in their briefing, if I'm remembering this correctly, that you hadn't argued, or hadn't argued below, or that there wasn't any connection between a medically determinable impairment and the inability to self-limit. And they point to Dr. Louie's testimony that there's nothing. He may have a problem, but it doesn't relate to any medically determinable impairment. And that was testimony which I elicited when I was cross-examining Dr. Louie. But that still doesn't explain why she completely discounted the testimony of Dr. Williamson Kirkland, and I would cite you to the Lester v. Chater opinion, particularly the error in rejecting the opinion, in that case, of Dr. Ko, because he wasn't a psychiatrist. But nevertheless, they felt that his opinion constituted competent psychiatric evidence. Now did you make the argument to the ALJ about that connection between, like, cognitive limitations and personality traits made him unable to self-limit? That argument wasn't really made below. You know, when you're before the administrative law judge, you're really presenting the medical evidence, and then after you get the decision and the rationale, and you understand why she reaches the decision she does, then you start to analyze it and say, well, is that really supported in the record? So I wouldn't say that the arguments were made one way or the other at the hearing. I would say the evidence was presented. Do you want to save a minute for rebuttal? I will just go on and simply say that if you read the vocational testimony, and if you accept Dr. Williamson Kirkland's opinions that he doesn't seem to be able to self-limit, then he can't sustain competitive gainful activity of any type, and the vocational counselor in his testimony agrees with that. So depending on how the hypothetical is posed to him, he has essentially two different conclusions. Thank you. Good morning, Your Honors. If it may please the Court, Kathy Rae for the Commissioner of Social Security. Bring the mics down just a little. Sure. Good. Thank you. Is that better? Yes. Contrary to Mr. Allison's arguments, the ALJ included all the limitations found supported by the record in the residual functional capacity. He appropriately presented a complete hypothetical to the vocational expert and relied on that testimony to conclude that Mr. Allison was not unable to perform work activities of the representative occupations listed. Mr. Allison presents an argument that the ALJ ignored the combined effects of his impairments. The ALJ noted at step found at step two that Mr. Allison had a cognitive disorder, he had avoidant dependent personality traits, and had post-status right arm injury. And he accepted Dr. Williamson Kirkland's opinion on how those impairments resulted in limitations. Dr. Williamson Kirkland repeatedly throughout the three years that he treated him noted that there was no reason that Mr. Allison could not return to work as long as he stayed within his limitations. But there's the kicker, that he couldn't stay within the limitations. Dr. Williamson Kirkland noted that he was making bad decisions. However, the ALJ properly rejected Dr. Williamson Kirkland's opinion on the mental impairments for a variety of different reasons. To begin with, the opinion of a treating physician is not binding on an ALJ with the existence to impairments are the ultimate issue of disability. Substantial evidence requires the ALJ provide specific and legitimate reasons for rejecting contradicted opinions of treating physicians. And that's what the ALJ did here. The ALJ noted that the neurological testing performed by Dr. Powell and relied on by the treating psychologist Dr. Ward did not support Dr. Williamson Kirkland's opinion that Mr. Allison's mental impairments prevented him from returning to substantial, or prevented him from performing substantial gainful activity. Dr. Williamson... I don't think anyone disagrees, however. He would always re-injure himself because he would try to overachieve. The examples that we have in the record were examples from jobs in which Mr. Allison's employers consistently asked him to perform duties outside of his limitations. They asked him at goodwill, they asked him to stock shelves, which was not within his limitations to avoid reaching over his head. Similarly, at Orion, which is the other example that we have in front of us, Mr. Allison himself noted in his testimony that they had him performing duties of a punch press operator that involved reaching over his head and operating machinery. Neither of those positions were relied on in the ALJ in this case. So Dr. Williamson Kirkland noted that Mr. Allison was at times exercising bad judgment. However, Dr. Williamson Kirkland never connected it to his mental impairment. If you look at the excerpts of record 222, which is one of the Mr. Allison's mental abilities, he noted that he simply noted he wasn't making good decisions. He wasn't noting that he was incapable of making good decisions or that his cognitive disorder or his personality traits prevented him from making good decisions. The only doctor on the record to directly address that question was Dr. Louis was asked the question directly, and Dr. Louis testified that he did not see any indication that there was a connection between his cognitive disorder and his inability to stay within his limits. He explained that you would expect to see frontal lobe damage, and I believe this is on 393, for your honors. You would expect to see frontal lobe damage in these circumstances, all of which were not evident here. And additionally, you would expect to see someone who had difficulties with impulse control. And again, that was contradicted by this record, and he noted that Mr. Allison was in fact quite conservative and aware of his limitations. So that said, the ALJ relied on the neurological testing by Dr. Powell and relied on them by treating psychologist Dr. Ward to find that he had some non-exertional limitations. He was limited, for instance, his avoidant dependent personality disorder would result in difficulties in interactions, and so he limited him into occasional public contact. He recognized the cognitive disorder and asked for Dr. Powell and Dr. Fordyce, who was referred by Dr. Ward, and Dr. Louie opined that based on those records, he believed Mr. Allison was capable of performing three- to five-step tasks, which is consistent with what the ALJ limited Mr. Allison to. So the ALJ was not ignoring the connection between the two, but merely analyzing which of Mr. Allison's decisions were as a result of his impairments and which were simply decisions. Dr. Ward concluded in her treating notes that there was no psychiatric reason why Mr. Allison could not work. Again, she opined that his brain injury resulted in verbal and auditory information processing difficulties with reading and writing. The ALJ accepted that and incorporated that into her findings. Dr. Ward also opined that from an emotional perspective, he was a well-adjusted, resourceful individual. She opined that he would be most successful in on-the-job training as opposed to an academic environment. And during her treatment notes, she noted twice in excerpts of records 320 and 330 that he was showing good judgment. The ALJ credited all of these opinions, and he incorporated them into the residual functional capacity as he was required to do. The ALJ was not required to incorporate hypotheticals that are not supported by the record. In Mr. Allison's brief, he discusses, for example, hazards and the inability to work around hazards. However, there's no medical testimony that Mr. Allison should not work around hazards. And in fact, the ALJ relied on jobs that did not involve being around or working around hazards. So therefore, the ALJ's decision at Step 5 relied on a proper hypothetical presented to the vocational expert based on a proper residual functional capacity that included all of the limitations found to be supported by the record. Do you think there are these kinds of jobs in the economy today? That, according to Social Security regulations, is not a concern for the ALJ. It's not a part of our analysis. So this is really kind of Alice in Wonderland. We go through all this, and we know he can't get a job because of the economy. Well, we know that at Step 5, the ALJ is presented with, she used the grids as a framework. And when there are non-exertional impairments that erode the to testify as to whether or not jobs exist in significant numbers in the national economy. And the vocational expert testified to jobs that existed, I believe the number he gave combined was over 600,000. But you are correct in that our Social Security regulations do not incorporate a way for economic circumstances to be incorporated or whether or not a person such as Mr. Allison will actually be hired for these jobs. Okay. Thank you. Thank you. Thank you, Counsel. I think you used all your time. So we will submit this matter at this time, and thank you for your arguments.
judges: Fletcher B. , Paez, Ikuta